No. 21-1795

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

MATTHEW JOHNSON, *et al.*,
*Appellants*,

v.

GOVERNOR OF NEW JERSEY, *et al.*,
*Appellees.*

On Appeal from the United States District Court for the District of New Jersey
No. 1:20-cv-06750, the Honorable Noel L. Hillman

## APPELLANTS' REPLY BRIEF

**NEW CIVIL LIBERTIES ALLIANCE**
JARED MCCLAIN
RICHARD A. SAMP
KARA ROLLINS
1225 19th St. NW, Suite 450
Washington, DC 20036
(202) 869-5210
Jared.McClain@NCLA.legal
*Counsel for Appellants*

# TABLE OF CONTENTS

TABLE OF CONTENTS ........................................................................................ i

TABLE OF AUTHORITIES ............................................................................... ii

SUMMARY OF ARGUMENT ............................................................................ 1

ARGUMENT ......................................................................................................... 2

I.   THE GOVERNOR HAS NOT CARRIED HIS FORMIDABLE BURDEN TO
     DEMONSTRATE MOOTNESS ...................................................................... 2

II.  THE SUPREME COURT HAS NEVER AFFORDED STATE LAWS AS MUCH
     DEFERENCE UNDER THE CONTRACTS CLAUSE AS THE TRIAL COURT DID
     BELOW ...................................................................................................... 6

     A. New Jersey's Prior Regulation of Residential Leases Cannot Overcome All
        Other Indicia of Substantial Impairment ............................................ 6

     B. The Stated Purpose of EO 128 Cannot Overcome the Contract Clause's
        Prohibition ........................................................................................ 13

CONCLUSION ................................................................................................... 18

# TABLE OF AUTHORITIES

## CASES

*Allied Structural Steel Co. v. Spannaus,*
   438 U.S. 234 (1978) ......................................................................... 9

*Arizonans for Official English v. Arizona,*
   520 U.S. 43 (1997) ......................................................................... 17

*Bronson v. Kinzie,*
   42 U.S. (1 How.) 311 (1843) ............................................................ 9

*Church of Scientology of Cal. v. United States,*
   506 U.S. 9 (1992) ........................................................................... 3

*Cinicola v. Scharffenberger,*
   248 F.3d 110 (3d Cir. 2001) ........................................................ 3, 5

*E. N.Y. Savings Bank v. Hahn,*
   326 U.S. 230 (1945) ...................................................................... 14

*Edwards v. Kearzey,*
   96 U.S. (6 Otto) 595 (1877) .......................................................... 11

*Ellis v. Brotherhood of Ry., Airline & S.S. Clerks,*
   466 U.S. 435 (1984) ........................................................................ 5

*Green v. Biddle,*
   21 U.S. (8 Wheat.) 1 (1823) .......................................................... 12

*Home Bldg. & Loan Ass'n v. Blaisdell,*
   290 U.S. 398 (1934) ................................................................ 10, 13

*Kravitz v. Murphy,*
   2021 WL 3043312 (N.J. App. Div. July 20, 2021) ........................... 2

*Main Line Fed. Sav. & Loan Ass'n v. Tri-Kell, Inc.,*
   721 F.2d 904 (3d Cir. 1983) ..................................................... 17, 18

*Nat'l Iranian Oil Co. v. Mapco Int'l, Inc.*,

    983 F.2d 485 (3d Cir. 1992) ..................................................................... 5

*Old Bridge Owners Co-op. Corp. v. Twp. of Old Bridge*,

    246 F.3d 310 (3d Cir. 2001) ........................................................... 17, 18

*Seneca Resources Corp. v. Twp. of Highland*,

    863 F.3d 245 (3d Cir. 2017) ................................................................ 3, 6

*Sveen v. Melin*,

    138 S. Ct. 1815 (2018) ................................................................ 8, 9, 10

*Troy, Ltd. v. Renna*,

    727 F.2d 287 (3d Cir. 1984) ................................................................ 6, 7

*U.S. Trust Co. of N.Y. v. New Jersey*,

    431 U.S. 1 (1977) ..................................................................... 9, 12, 14

*United States v. Munsingwear*,

    340 U.S. 36 (1950) .......................................................................... 17

*United Steel Paper & Forestry Rubber Mfg. Allied Indus. & Serv. Workers Int'l Union v. Gov't of V.I.*, 842 F.3d 201 (3d Cir. 2016) ......................................... 3, 18

*W.B. Worthen Co. v. Kavanaugh*,

    295 U.S. 56 (1935) ................................................................. 9, 10, 14

## STATUTES

N.J.S.A. § 46:8-19 ................................................................................ 16

N.J.S.A. § 40:62-14 .............................................................................. 16

## SUMMARY OF ARGUMENT

Unable to rebut the substance of Appellants' arguments and the case law cataloged in their opening brief, the Governor of New Jersey relies instead on adverbs and conclusory statements to support his theory of an enervated Contracts Clause that would give him virtually limitless power to interfere with private contracts. While the Governor's brief is disappointing from a basic civics' standpoint, it's unsurprising that a governmental body would try to greedily expand its own power. In fact, the Founders expected such behavior. This sort of overreach is exactly why our Constitution separated governmental power and enumerated certain rights to protect personal liberty.

One right that the Constitution explicitly safeguards is the right to contract free from impairment by a state government. In the Governor's view, however, the text and meaning of that constitutional provision are unimportant, and the provision no longer applies whenever a party contracts within a regulated industry. The existence of some regulation, the theory goes, defeats any expectation by regulated parties that a state will not impair their contracts. Put differently, by simply passing prospective legislation in a certain field, a state grants itself limitless future power to retroactively destroy any vested contractual rights in that field. As the district court's opinion and the Governor's brief both illustrate (albeit inadvertently), this constitutional end-around would all but erase the Contracts Clause from the Constitution. Appellants ask this

Court to restore the rule of law and, with it, their ability to rely on their freely negotiated contracts that they depend on to make ends meet.

## ARGUMENT

## I. THE GOVERNOR HAS NOT CARRIED HIS FORMIDABLE BURDEN TO DEMONSTRATE MOOTNESS

Although Appellants have already responded fully to the Governor's suggestion of mootness (ECF 27), this brief will focus on a few legal errors about mootness that persist in the Governor's merits brief.

When the Governor filed his premature motion to dismiss on June 16 (ECF 16), any residential tenant in New Jersey could still invoke EO 128 up until July 4, thereby giving themselves an extra six months of protection even after the order expired. Consequently, as the New Jersey Appellate Division ruled (without relying on a more expansive version of state-court jurisdiction), the legality of EO 128 presents a live controversy through at least December 6, 2021. *See Kravitz v. Murphy*, 2021 WL 3043312, at *1, n.1 (N.J. App. Div. July 20, 2021) (rejecting Governor Murphy's mootness arguments because "the terms of EO 128 explicitly keep the order's effects in place for at least six months after the expiration of EO 128"). About a week after Appellants filed their opposition to that motion to dismiss on June 28 (ECF 27), however, EO 128 finally expired.[1]

---

[1] Although those tenants who invoked the order before July 4 *still* enjoy the order's protection, none of Appellants' current tenants are among that group.

But "[a] case is not necessarily moot simply because the challenged law has expired[.]" *United Steel Paper & Forestry Rubber Mfg. Allied Indus. & Serv. Workers Int'l Union v. Gov't of V.I.*, 842 F.3d 201, 208 (3d Cir. 2016). This case will become moot *only* when this Court can no longer provide "meaningful relief" and Appellants lack any "legally cognizable interest in the outcome." *Id.* (citations omitted). So long as Appellants retain their "interest in the outcome of the litigation, regardless of size, … a live case or controversy exists. Thus, the case will be moot only if it is '*impossible* for the court to grant effectual relief.'" *Cinicola v. Scharffenberger*, 248 F.3d 110, 119 (3d Cir. 2001) (quoting *Church of Scientology of Cal. v. United States*, 506 U.S. 9, 12 (1992)) (emphasis added). As the party claiming mootness, the Governor bears "the 'heavy,' even 'formidable' burden" of demonstrating that the case is moot. *Seneca Resources Corp. v. Twp. of Highland*, 863 F.3d 245, 254 (3d Cir. 2017) (citations omitted).

Even though Appellants' tenants can no longer invoke EO 128, this case remains a valid and ongoing controversy for two reasons. *First*, Governor Murphy's adoption of EO 128 will continue to have a direct impact on the reasonable expectations of all parties entering into residential leases in New Jersey. Under the Governor's theory of the Contracts Clause, which the district court adopted, EO 128 is now the sort of past regulation of which housing providers like Appellants have been placed on notice and must price into their contracts. They must also factor in the fact that a federal court held that the express terms of their residential leases are unenforceable because housing providers operate in a regulated industry. Their contracts are worth less now and in

3

the future so long as the Governor is free to decide unilaterally that it would be in tenants' economic interest—and therefore the public interest—to prevent housing providers from enforcing their express contractual rights. That means they must increase rent to compensate for the district court's decision; and increased rent decreases demand.

When it suits him for purposes of arguing mootness, though, Governor Murphy reverses position and says that EO 128's impact on future leases is mere conjecture. Resp. Br. at 20-21. The Governor cannot have it both ways. Indeed, the causal chain from EO 128 to devalued leases is much more closely linked than is the Governor's conjecture that some regulation of leases puts all leaseholders on notice of the possibility of *all* future retroactive changes to *any* law governing leases. And by divesting all residential housing providers of their contractual right to rely on a security deposit, the Governor has decreased the value of security deposits and the residential leases that rely on such deposits. More than a century of industry practice shows that housing providers value security deposits. A decision by this Court that the Governor lacks the power he claims will restore those leases to their pre-EO 128 value.

*Second*, the Governor's own arguments once again undermine his suggestion of mootness. On the one hand, the Governor says, EO 128 was necessary—even though tenants faced no threat of eviction—because tenants would face interest and late fees unless they were allowed to use their security deposits to pay rent. Resp. Br. 9, 38. But on the other hand, the Governor suggests that this Court does not retain its jurisdiction

under the collateral-consequences doctrine because Appellants would not be entitled to sue for interest and fees even if their tenants were held to have wrongfully moved their security deposit toward rent in breach of their lease. Resp. Br. 21-22. If this Court were to hold that EO 128 was *ultra vires*, Appellants would maintain a viable damages action against their tenants for that breach, as well as the interest and fees to which they would be entitled in that damages action. The amount in interest and fees to which Appellants would be entitled in that action would be greater if their tenants were unable to rely on Governor Murphy's unlawful order as a defense for their breach of lease.

As Appellants explained in their opposition to the motion to dismiss (pp. 6-9), the collateral-consequences doctrine saves a case from mootness even when a potential damages claim and its likelihood of recovery are both small. *Nat'l Iranian Oil Co. v. Mapco Int'l, Inc.*, 983 F.2d 485, 489-90 (3d Cir. 1992) (citing *Ellis v. Brotherhood of Ry., Airline & S.S. Clerks*, 466 U.S. 435, 442 (1984)). The Governor attempts to avoid this doctrine by claiming wrongly that it applies only to already-filed cases. But such a requirement does not exist in Third Circuit case law and, to the contrary, is rebutted by this Court's decision in *Cinicola v. Scharffenberger*, which held that a case was not moot because the plaintiffs "*may* have a claim for rejection damages." 248 F.3d 110, 119 (3d Cir. 2001) (emphasis added). Just as in *Cinciola*, the fact that this Court's decision could give rise to a potential damages claim is enough to prevent dismissal for mootness.

The issues in this case remain in controversy, and Appellants still have a concrete interest in the outcome. The Governor has failed to meet his "formidable" burden to prove otherwise. *See Seneca Resources*, 863 F.3d at 254.

## II. THE SUPREME COURT HAS NEVER AFFORDED STATE LAWS AS MUCH DEFERENCE UNDER THE CONTRACTS CLAUSE AS THE TRIAL COURT DID BELOW

### A. New Jersey's Prior Regulation of Residential Leases Cannot Overcome All Other Indicia of Substantial Impairment

It is telling that Governor Murphy begins his Contracts Clause analysis by wrongfully elevating the importance of whether the contracting parties were operating within a regulated industry. *See* Resp. Br. 28 (adding the word "most" when describing this factor's importance). In the Governor's view, all that matters in this case is the fact that residential leases are, generally speaking, a regulated field. *See* Resp. Br. 28-33. Relying on prior statutory regulation of security deposits, Governor Murphy asserts unlimited authority to rewrite the express terms of leases. The point he misses is that prior regulation in an industry is simply *one* factor for determining the contracting parties' *ex ante* expectations; the mere existence of regulation in a field does not allow the state to upset expectations within an industry without searching judicial review. Otherwise, the Contracts Clause would no longer serve any purpose in regulated industries—which is to say, in any industries.

Compounding his misunderstanding, the Governor also overreads this Court's discussion in *Troy, Ltd. v. Renna*, 727 F.2d 287 (3d Cir. 1984). At issue in *Troy* was the

Tenancy Act, which amended the provisions of law enacted seven years prior by the Anti-Eviction Act. *Id.* at 297. When the New Jersey legislature passed the Tenancy Act, the preexisting law already mandated that, when converting an apartment to a condo, the owner had to provide certain elderly tenants with "an eight-year extension of the lease—or a four-year extension coupled with a 'hardship compensation payment'—if the landlord did not offer the tenant comparable housing." *Id.* The Tenancy Act extended this protected-tenancy period from eight years to 40 years. *Id.* at 291.

In rejecting a Contracts Clause challenge to the Tenancy Act, this Court reasoned that the similar provision in the Anti-Eviction Act meant that the relationship between property owners hoping to convert an apartment and their elderly tenants was already "specified to a large extent by statute." *Id.* Consequently, the change in law "only operate[d] to protect those *statutory* tenants whose relationship with their landlord ha[d] already become non-consensual by virtue of the Anti-Eviction Act." *Id.* (emphasis added). "That is, the Tenancy Act simply enlarge[d] the terms of a statutory tenancy *already created* by the Anti-Eviction Act." *Id.* (emphasis added). Accordingly, this Court concluded that "[s]uch an enlargement of an already-regulated statutory tenancy [wa]s probably not an impairment at all." *Id.*

What the Governor seeks to get away with here, however, is much different. In contrast to the change in degree at issue in *Troy*, EO 128 effected a change in kind. This transformation in law was not some technical increase in interest rates or the time

7

allowed to return a security deposit; instead, EO 128 eliminated reliance on security deposits *altogether*. Despite his string cite to statutes governing residential leases, Governor Murphy can point to none that would have put Appellants on notice that they might lose their rights to rely on security deposits entirely. Nor has he even attempted to rebut the fact that housing providers in New Jersey have relied on security deposits for over a century—a right enshrined in the Security Deposit Act. *See* Opening Br. at 42.

Instead, he miscites *Troy* for the novel proposition that the relevant analysis "is whether the industry writ large is so pervasively regulated that participants must be on notice of more changes generally[.]" Resp. Br. 33. But this sort of inverted preemption analysis is nowhere to be found in *Troy*—or any other case on which the Governor relies. The relevant question remains whether the change in law interfered with Appellants' reasonable expectations. *Sveen v. Melin*, 138 S. Ct. 1815, 1822 (2018). And Governor Murphy cannot explain how New Jersey's prior regulation of residential leases could have possibly put Appellants on notice that the Governor might one day rule that they could no longer enforce their vested contractual right to a security deposit.

The other indicia of a contracting parties' expectations that Appellants identified in their opening brief (pp. 33-35) are either misunderstood or ignored entirely by the Governor. *See, e.g.*, Resp. Br. 46 (attempting to downplay the remedy/obligation distinction without addressing its effect on Appellants' legitimate expectations). Governor Murphy has no response for the fact that EO 128 impaired an express

obligation of Appellants' contracts for the duration of the contract, leaving Appellants unable to restore their rights until *six months after* their lease expires. The Supreme Court has repeatedly identified these factors as indicating that a law upsets the parties' legitimate expectations. *See, e.g., Allied Structural Steel Co. v. Spannaus*, 438 U.S. 234, 247 (1978) (impairing an express covenant violates Contracts Clause, especially when it "did not effect simply a temporary alteration of the contractual relationships … but worked a severe, permanent, and immediate change in those relationships—irrevocably and retroactively"); *Bronson v. Kinzie*, 42 U.S. (1 How.) 311, 320-21 (1843) (same); *see also U.S. Trust Co. of N.Y. v. New Jersey*, 431 U.S. 1, 19, n.17 (1977) (impairing a contractual obligation rather than a remedy is more likely to upset the parties' expectations).

Similarly, the Governor's attempt to downplay the importance of a court's equitable power is unconvincing. Resp. Br. 47. After rejecting Appellants' reliance on Supreme Court precedent as "outdated" (pp.44-45),[2] the Governor struggles to downplay the Court's continued reliance on that case law in its most recent Contracts Clause decision. In *Sveen*, the Court applied its precedent in concluding that the

---

[2] The Governor suggests that Appellants rely only on "outdated" case law and give short shrift to the Supreme Court's "modern" two-part test, despite the fact that Appellants' opening brief dedicated 19 pages to applying that test. *See* Opening Br. Section II.B. ("EO 128 Does Not Satisfy the Supreme Court's Contracts Clause Test"), at 31-50. Moreover, as Appellants pointed out in their opening brief (pp. 30-31), the Supreme Court made clear in *Sveen* that those "outdated" cases are still good law. 138 S. Ct. at 1822 (tracing the Court's rationale to its decisions "as far back as the early 1800s"). And just one term after *Blaisdell*, the Court struck down a law for much the same reasons that Appellants press here. *See W.B. Worthen Co. v. Kavanaugh*, 295 U.S. 56, 63 (1935).

Minnesota law at issue did not violate the Contracts Clause because it effected no more change than a court in equity could have. 138 S. Ct. at 1823. The Governor says without citation that "there is obviously no rule limiting the police powers of the States to those exercised by courts of equity[.]" Resp. Br. 46. But the Court's extended discussion of a court's equitable powers in *Sveen* suggests otherwise. *Id.* at 1822 (holding that "the law [wa]s unlikely to disturb any policyholder's expectations because it d[id] no more than a divorce court could always have done"); *id.* at 1823 (reasoning that a party could not reasonably rely on a beneficiary designation because "divorce courts have wide discretion to divide property between spouses when a marriage ends"); *id.* (explaining that "[t]he power of divorce courts over insurance policies is relevant here because it affects whether a party can reasonably expect a beneficiary designation to survive a marital breakdown"). Also cutting against the Governor's assertion are the Court's decisions in *Home Bldg. & Loan Ass'n v. Blaisdell*, 290 U.S. 398, 446 (1934) (upholding the law because a court in equity could impose similar conditions on foreclosure), and *W.B. Worthen Co. v. Kavanaugh*, 295 U.S. 56, 63 (1935) (holding that a law violated the Contracts Clause because "[t]here has been not even an attempt to assimilate what was done by this decree to the discretionary action of a chancellor in subjecting an equitable remedy to an equitable condition").

Even under Governor Murphy's incredible theory that every Supreme Court decision before the Great Depression was overruled *sub silentio*, post-*Blaisdell* precedent still supports Appellants' Contracts Clause claim.

What remains is Governor Murphy's assertion that his order did nothing to diminish the value of Appellants' contracts because the tenants "remained on the hook for the same payments." Resp. 34. That assertion is unpersuasive for several reasons. As Appellants highlighted above, the assertion is undermined by the fact that the stated purpose of EO 128 was to save tenants from incurring interest and fees to which Appellants were entitled under the express terms of their leases—money that would have compensated Appellants for their hardship—while depleting the financial security for which Appellants contracted to protect their property. Secondly, a security deposit has value. That value is exactly why Appellants contracted for the right to hold a security deposit, just as nearly all housing providers in New Jersey have done for over 100 years. The theoretical ability to hale several delinquent tenants into court— assuming they can find the tenants and the tenants aren't judgment proof—has a cost. Governor Murphy's attempt to blame the Kravitzes for still not recovering the damage to their property illustrates just how detached the Governor's argument is from reality. An empty legal right to damages (less interest and fees that would have otherwise accrued) does not pay the bill at the hardware store. Deprived of their security deposit, that money came out of the Kravitzes pockets. EO 128 divested the Kravitzes of their contractual right, protected by the Constitution, to hold in escrow a sum of money to cover any damage to their property. Their contract was worth less because EO 128 stripped that express covenant. *See Edwards v. Kearzey*, 96 U.S. (6 Otto) 595, 601, 607 (1877) ("One of the tests that a contract has been impaired is [] that its value has by

legislation been diminished."); *Green v. Biddle*, 21 U.S. (8 Wheat.) 1, 75-76 (1823) ("[C]onditions and restrictions tending to diminish the value and amount of the thing recovered, impairs [the contracting party's] right to, and interest in, the property.").

With the value of Appellants' contracts lessened by EO 128, the law imposed a substantial impairment because it failed to compensate housing providers. The Supreme Court made as much clear in *U.S. Trust*, 431 U.S. at 19. The law in that case repealed a security provision on which the contracting party had relied. *Id.* Although "no one c[ould] be sure precisely how much financial loss the bondholders suffered" from the loss of that security, the Court emphasized that "the question of valuation need not be resolved … because the State [] made *no* effort to compensate the bondholders for any loss sustained by the repeal." *Id.* (emphasis added). Much like the security deposits at issue here, the Court reasoned that the covenants in *U.S. Trust*, as "a security provision, … w[ere] not superfluous[.] … Nor was the covenant modified or replaced by an arguably comparable security provision. Its outright repeal *totally eliminated* an important security provision and thus impaired the obligation of the States' contract." *Id.* (emphasis added). EO 128 also eliminated an important security on which Appellants relied without compensating them. This Court need not determine the exact valuation of that security to hold, as in *U.S. Trust*, that EO 128 substantially impaired Appellants' contracts.

Indeed, the *Blaisdell* decision—the only Supreme Court case that matters, according to Governor Murphy—discussed at length the need for the state law to

compensate contracting parties for the diminished value of a contract to avoid substantially impairing those contracts. *See* 290 U.S. at 431-34 (distinguishing *Bronson* because, in that case, "there was no provision, as in the instant case, to secure to the mortgagee the rental value of the property during the extended period."); *id.* 441-42 ("[P]rovision was made for reasonable compensation to the landlord during the period he was prevented from regaining possession."); *id.* at 445 ("The mortgagee-purchaser during the time he cannot obtain possession [] is not left without compensation for the withholding of possession.").

Ironically, Governor Murphy has it right in his brief. His failure to compensate New Jersey housing providers for the diminished value of their contracts is "fatal in fact." Resp. Br. 42. As Appellants established in their opening brief (pp. 33-35), EO 128 contains six of the seven indicia that the Supreme Court has identified for finding substantial impairment. That New Jersey has previously passed laws regulating security deposits is not enough to overcome these other six factors. EO 128 substantially impaired Appellants' leases.

### B. The Stated Purpose of EO 128 Cannot Overcome the Contract Clause's Prohibition

In attempting to contrive a legitimate public purpose for EO 128, Governor Murphy's brief offers a flashback to the 1780s when state executives could still impair vested contractual rights for the temporary financial benefit of a favored constituency. Although New Jersey law has prevented residential evictions since the beginning of the

pandemic and will continue to do so until 2022, he claims that EO 128 was still in the public interest because it benefited residential tenants to have more money in their pockets, despite the fact that many housing providers were also hurting financially and had contracted to hold that money as security for their property.

Appellants do not dispute that keeping people housed during a statewide emergency may be a legitimate public purpose. But the eviction moratorium already accomplished that policy goal. So, the Governor must claim that allowing tenants to use their security deposit to pay one month's rent over the course of 15 months will somehow stop tenants from self-evicting when they would have otherwise.

Governor Murphy's unsubstantiated assertion that EO 128 will prevent self-eviction, despite the ongoing moratorium, deserves no deference. As Appellants explained in their opening brief (pp. 19-22), states do not have a constitutional right to deference under the Contract Clause—much less the "considerable deference" Governor Murphy says this Court "must" give his unilateral decision-making. Resp. Br. 41. There was no legislative judgment to which this Court could defer. *See E. N.Y. Savings Bank v. Hahn*, 326 U.S. 230, 234 (1945); *Kavanaugh*, 295 U.S. at 60; *see also U.S. Trust*, 431 U.S. at 22-23 (citing *Hahn*).

No Supreme Court case has ever afforded states the total deference that Governor Murphy demands here, and which EO 128 requires to survive judicial scrutiny. The trial court's ruling in Governor Murphy's favor set a dangerous precedent that will undermine vested contractual rights in all regulated industries and increase the

cost of contracting. As a result, rental-housing prices will increase for the same constituency the Governor tried to protect in the short-term—just as was the case for all the debtors who the states relieved of their contractual obligations under the Articles for Confederation. Opening Br. 27-29. The short-sighted nature of such laws is precisely why the Founders included the Contracts Clause in the Constitution—to prevent state interference with contracts on behalf of a favored constituency. In this way, the Constitution decreed that the public's interest extends beyond the immediate benefit of a current political majority. That the Governor's reelection may depend more heavily on support from tenants than from housing providers does not transform one constituency's interest into a general public interest. EO 128 violates an express constitutional protection without reasonably advancing a legitimate public interest.

Finally, although there is no precedent for Governor Murphy's approach of evaluating a law's public purpose through the benefits of other, unrelated government programs, the lip service that Governor Murphy pays toward the good he's done for housing providers bears mentioning. In apparent earnest, Governor Murphy first points to a 90-day grace period for mortgage payments and foreclosures that expired in June 2020, over a full year before the legislature ended EO 128. Resp. Br. 7. Likewise, to the extent housing providers were eligible for the grant program, that also ended a over a year before the legislature ended EO 128. Resp. Br. 8. Meanwhile, EO 128 imposed a permanent impairment on residential leases and remained in effect until July 4, 2021 (with its consequences lasting indefinitely).

Governor Murphy also says that "Appellants altogether put aside the benefits landlords received from prompt access to rent payments." Resp. Br. 39. Of course, Appellants don't mention this "benefit" because it was none. Appellants and their tenants were *always* free to re-negotiate their security deposits if doing so would benefit both parties to the contract. EO 128 did nothing to change this fact. Rather, the order placed all the bargaining power with the tenants, requiring that housing providers consent to the moving of a security deposit without imposing that same requirement on tenants.

Take the Johnsons for example. Their tenant has not paid any rent since the eviction moratorium took effect. Despite being owed over $20,000 (money they will never recover), the Johnsons remain responsible for maintaining the home's habitability. Just this week, the Johnsons attempted to refinance the property to help cover the ever-growing costs associated with housing their tenant for free. But the bank denied their refinancing because, unbeknownst to the Johnsons, the City of Vineland had placed a municipal lien of the Johnsons property under N.J.S.A. § 40:62-14. It turns out that their tenant stopped paying her electric bill and New Jersey allows municipalities to place a lien on the property for unpaid utilities, regardless of whether the property's owner racked up the utility bill. Under the cruel irony of Governor Murphy's scheme, New Jersey law still prevents the Johnsons from withdrawing their tenant's security deposit from its interest-bearing escrow account to help resolve the lien on the property so they can refinance. *See* N.J.S.A. § 46:8-19. EO 128 did nothing

to give the Johnsons "prompt access" to that security deposit. All Governor Murphy's order did was distort the contractual relationship between housing providers and their tenants. His decision to do so furthered only the tenants' interests and was not a reasonable way to promote a legitimate public purpose.

## III. VACATUR IS APPROPRIATE IF THIS COURT DETERMINES THE CASE IS MOOT

If this Court were to decide that Appellants' case became moot while this appeal was pending, the "proper disposition" is to vacate the district court's decision. *Main Line Fed. Sav. & Loan Ass'n v. Tri-Kell, Inc.*, 721 F.2d 904, 907 n.4 (3d Cir. 1983) (citing *United States v. Munsingwear*, 340 U.S. 36 (1950)). Vacatur provides equitable relief to Appellants to prevent the trial court's ruling from prejudicing them without the benefit of appellate review on the merits. *See Old Bridge Owners Co-op. Corp. v. Twp. of Old Bridge*, 246 F.3d 310, 314 (3d Cir. 2001) ("We conclude that the FDIC should not be penalized by allowing the District Court's ruling to stand when it is precluded, through no fault of its own, from having that decision reviewed on the merits."). This disposition is particularly appropriate "when mootness occurs through happenstance … or the 'unilateral action of the party who prevailed in the lower court.'" *Arizonans for Official English v. Arizona*, 520 U.S. 43, 71-72 (1997) (citation omitted).

The trial court's erroneous application of the Contracts Clause (based on its "substantial deference" to Governor Murphy's impairment of Appellants' contracts) will have lasting and prejudicial effects on Appellants' contractual rights as housing

providers. As discussed above, EO 128—and the trial court's erroneous ruling that Appellants did not even state a claim for relief under the Contracts Clause—will continue to devalue Appellants' leases and the residential-housing market more generally. If the Governor is correct about mootness, then through no fault of Appellants, EO 128 did not remain in place for long enough to prosecute a case in the trial court and on appeal. *See United Steel Paper*, 842 F.3d at 208 ("[T]he duration of VIESA—two years—is too short to be fully litigated prior [to] its expiration."). It would be inequitable for Appellants to suffer under the district court's precedential decision that effectively writes the Contracts Clause out of the United States Constitution. *See Old Bridge Owners Co-op.*, 246 F.3d at 314. Vacatur of that erroneous decision would be the appropriate remedy if this Court were to determine that it lacks jurisdiction to reverse the trial court's ruling on the merits. *See Tri-Kell, Inc.*, 721 F.2d 907 n.4.

## CONCLUSION

This Court should reverse or vacate the judgment below.

October 6, 2021

Respectfully,

/s/ Jared McClain

NEW CIVIL LIBERTIES ALLIANCE
JARED MCCLAIN
RICHARD A. SAMP
KARA ROLLINS
1225 19th St. NW, Suite 450
Washington, DC 20036
(202) 869-5210
Jared.McClain@NCLA.legal
*Counsel for Appellants*

**CERTIFICATE OF COMPLIANCE**

I certify that this brief complies with the requirements of Federal Rule of Appellate Procedure 32(a)(5) and (6) because it has been prepared in 14-point, plain, roman-style font. This brief also complies with the type-volume limitations of Federal Rule of Appellate Procedure 32(a)(7). This brief contains 4,654 words.

I further certify that the electronic version of this brief was scanned with SentinelOne Antivirus. It contains no known viruses.

Respectfully,

/s/ Jared McClain
Jared McClain
New Civil Liberties Alliance

**CERTIFICATE OF SERVICE**

I hereby certify that I electronically filed Appellants' Opening Brief & Appendices with the Clerk of the Court for the United States Court of Appeals for the Third Circuit by using the appellate CM/ECF system on October 6, 2021. Participants in the case who are registered CM/ECF users will be served by the CM/ECF system.

Respectfully,

/s/ Jared McClain
Jared McClain
New Civil Liberties Alliance
1225 19th Street NW, Suite 450
Washington, D.C. 20009
(202) 869-5210
Jared.McClain@NCLA.legal